## OSCAR WINGFIELD v. STATE.

No. A-5692.   Opinion Filed Jan. 14, 1928.
(263 Pac. 158.)

Chester H. Lowry, Brown Moore, and R. J. Shive, for plaintiff in error.

Edwin Dabney, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error, hereinafter referred to as defendant, was, by information filed in the county court of Payne county, Okla., charged with larceny of about 112 yards of 32-inch hog wire fence. Defendant entered his plea of not guilty to the charge. The testimony on behalf of the state is, in substance, as follows:

George Carrothers testified:

That on the 22d day of February, 1925, some one drove up near his house in a Ford car, and took his wire from his fence; there being about 112 yards of his wire taken. That the amount taken was worth about $11 or $12. That the wire was about two years old. That it had some vines upon it and a special mark on the wire. "I marked it because there was so much thieving going on down there that a man had to mark his stuff. I found the wire on Oscar Wingfield's fence, right close to the house, right by the yard fence. After Wingfield was arrested down at Ripley, I asked Oscar where he got the wire, and he said, 'I will tell you the day of the trial.' "

On cross-examination the witness stated:

He had known the defendant for about twelve years; that there was no bad blood between them. "I did not see Oscar Wingfield remove it. I did not see anybody. My wife drew the picture of the tires. She does my writing for me. I filed a replevin suit before a justice of the peace to get the wire." The case is still pending; it has never been decided whose wire it is. Oscar Wingfield and his wife live with his mother on the old J. J. Wingfield homestead.

Mona Carrothers, wife of George Carrothers, testified, in substance, the same as her husband. She also testified that she saw the wire on the Wingfield fence. "I suppose the fence belonged to Mrs. Wingfield. Oscar Wingfield lives with his mother. The fence was along the road. We found it at the place where Oscar lives. Exhibit A was drawn by me about two months after the wire was taken. It is a good representation of the mark made by the tires. Oscar drove a Ford car part of the time."

The evidence on behalf of the defendant was as follows: Mrs. J. J. Wingfield stated:

"I am the mother of Oscar Wingfield; Oscar lives with me. I have lived there ever since the country was opened. The probate court gave the farm to me as a homestead. After my death, the place goes to the children. I was at home when Carrothers and the constable come and got the wire. They got it off my hog pasture. It was my wire. It had been there for seven years."

On cross-examination Mrs. Wingfield testified:

"My husband bought that wire; I was with him when he bought it. A colored boy put the wire on the fence. I can't remember the time he put it on. I had this negro boy to roll this wire up, and, after a while, when the boys were busy on the other fence, I told him to take the wire and stretch it on the hog fence. I know the wire that Carrothers and the constable took off my fence had been there six or seven years; my husband bought it."

Gene Messcre testified that he sold wire to J. J. Wingfield prior to his death.

In rebuttal, the state called J. G. Combs and Mrs. Josie Combs, his wife, who in substance, testified that they lived on the Wingfield place at one time. They did not know how much wire was on the Wingfield place, but they did not remember having seen any 32-inch hog wire on the place.

Mrs. J. J. Wingfield was recalled, and testified that the wire had been on the place five, six or seven years, she could not just say when she bought it. This in substance, being the testimony of both the plaintiff and defendant.

The defendant, at the close of the state's testimony, demurred to the evidence of the state upon the following grounds:

"(1) That the evidence of the state wholly failed to support the material allegations of the information filed in said cause.

"(2) For the reason and upon the grounds that the evidence of the state has not shown anything, only shown the recent possession of the property, the subject of larceny, and that such evidence unsupported and uncorroborated is not sufficient to sustain the verdict of guilty against the defendant.

"(3) For the reason that the evidence of the state does not show that this defendant has committed any public offense against the laws of the state of Oklahoma."

The demurrer was overruled, and defendant reserved an exception. A jury was impaneled, and, after hearing the evidence and receiving the instructions of the court, retired to consider its verdict, and thereafter returned into court the following verdict:

"In the County Court of Payne County, State of Oklahoma. Oscar Wingfield, Plaintiff, v. State of Oklahoma, Defendant. No. 4341. Verdict. We, the jury duly impaneled and sworn to try the issues in this cause, do upon oath find the defendant guilty as charged in the information, and fix his punishment at _____ or by the court.
"D. C. Freeman, Foreman."

The defendant objected and excepted to the verdict as returned by the jury. Motion for a new trial was filed, considered, and overruled. Defendant duly excepted. Defendant was sentenced to pay a fine of $50 and costs of the action, and to serve a period of ten days in the jail of Payne county, Okla. From the sentence and judgment the case is brought to this court for review.

We will consider first defendant's second assignment of error, which is as follows:

"(2) The court erred as a matter of law in receiving the verdict of the jury in said cause."

Defendant contends that the verdict in this case is not sufficiently clear and in proper form to sustain the sentence imposed by the court on him. It is necessary then to consider the form of the verdict returned, and to ascertain

whether or not the verdict is in such form as would justify the court in imposing a sentence on the defendant, or is it too vague and uncertain to support the judgment?

In Rea v. State, 6 Okla. Cr. 366, 118 P. 815, the jury returned the following verdict:

"We, the jury, drawn, impaneled, and sworn in the above-entitled cause, do upon our oaths find the defendant guilty as charged in the indictment herein and impose a fine of $50, and recommend that the court suspend the jail sentence."

The court, in considering the form of the verdict, says:

"The verdict in form returned is insufficient to support a judgment of conviction and sentence. Under the law, in a verdict of guilty, the jury may assess and declare the punishment, which must, in cases of this kind, be both fine and imprisonment, or if they fail to agree on the punishment, or do not assess the punishment, the court shall assess the punishment. Having returned an erroneous and informal verdict, it was the duty of the court to direct them to reconsider the verdict. * * *

" 'If the jury rendered a verdict not in form, the court may, with proper instructions as to the law, direct them to reconsider it, and it cannot be recorded until it be rendered in some form from which it can be clearly understood what is the intent of the jury.' "

In Campbell v. State, 14 Okla. Cr. 319, 170 P. 915, this court said:

"A verdict finding the defendant 'guilty as charged in the information and submit his punishment to the court' is insufficient as to form and is too vague and uncertain to support a judgment for the highest degree of the offense charged."

In the case of George et al. v. State, 28 Okla. Cr. 388, 231 P. 318, this court says:

"On a trial of two defendants, charged with violations of the prohibitory liquor law a verdict merely finding the

defendants 'guilty' is not sufficiently certain to enable the court to pronounce judgment."

The verdict in this case is too indefinite, vague, and uncertain in form; not being sufficiently clear for any one to understand what the jury intended. It was clearly the duty of the court, when the defendant objected to the verdict being received, to have, under proper instruction, directed the jury to return to the jury room and prepare a proper form of verdict explaining clearly what the intent of the jury was.

We hold that the objection of the defendant to the receiving of the verdict was well taken, and the court should have sustained the same, and that the court committed an error in overruling the objection of the defendant to the receiving and recording of the verdict.

There are other errors assigned and argued by the defendant, but in the view we take of this record, as to the form of the verdict, we do not deem it necessary to consider them.

The case is reversed and remanded.

DOYLE, P. J., and EDWARDS, J., concur.